**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SEATTLE PACIFIC UNIVERSITY, *Plaintiff-Appellant*, | No.22-35986 |
| v. | D.C. No. 3:22-cv-05540-RJB |
| ROBERT FERGUSON, in his official capacity as Attorney General of Washington, *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted November 16, 2023
Seattle, Washington

Filed June 7, 2024

Before:  M. Margaret McKeown and Ronald M. Gould,
Circuit Judges, and Richard D. Bennett,[*] District Judge.

Opinion by Judge McKeown

---

[*] The Honorable Richard D. Bennett, United States District Judge for the District of Maryland, sitting by designation.

## SUMMARY[**]

### First Amendment/Standing

The panel affirmed in part and reversed in part the district court's dismissal of an action brought by Seattle Pacific University ("SPU") alleging First Amendment violations arising from the Washington Attorney General's investigation under the Washington Law Against Discrimination ("WLAD") into the University's employment policies and history.

SPU is a religious university that prohibits employees from engaging in same-sex intercourse and marriage. After receiving complaints, the Washington Attorney General sent SPU a letter requesting documents related to the University's employment policies, employee complaints, and employee job descriptions. In response, SPU filed suit against the Washington Attorney General to enjoin the investigation and any future enforcement of WLAD. The district court dismissed the suit on the basis of lack of redressability and *Younger* abstention.

Affirming in part, the panel held that SPU failed to allege a cognizable injury in fact for its retrospective claims alleging that the Attorney General's investigation and request for documents chilled its religious exercise. The Attorney General's request for documents carried no stick because SPU would not face sanctions for ignoring it. Moreover, although inquiring into the employment conditions of ministers may offend the First Amendment, an

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

inquiry into which employees are ministerial is fair game because the ministerial exception's status as an affirmative defense makes some threshold inquiry necessary.

Reversing in part, the panel held that SPU had standing for its prospective pre-enforcement injury claims. SPU evidenced a sufficient intention to continue employment practices that are arguably proscribed by WLAD, the Attorney General has not disavowed its intent to investigate and enforce WLAD against SPU, and SPU's injury is redressable. *Younger* abstention is not warranted because there are no ongoing enforcement actions or any court judgment. The panel remanded the district court to consider prudential ripeness in the first instance.

---

## COUNSEL

Lori H. Windham (argued), Joseph C. Davis, Daniel D. Benson, Laura W. Slavis, and Daniel M. Vitagliano, and Rich Osborne, The Becket Fund for Religious Liberty, Washington, D.C.; Nathaniel L. Taylor, Abigail St. Hilaire, and Daniel J. Ichinaga, Ellis Li & McKinstry PLLC, Seattle, Washington; for Plaintiff-Appellant.

Daniel J. Jeon (argued), David Ward, and Patricio A. Marquez, Assistant Attorneys General; Robert W. Ferguson, Washington Attorney General; Office of the Washington Attorney General, Civil Rights Division, Seattle, Washington; for Defendant-Appellee.

Matthew T. Nelson, Conor B. Dugan, and Katherine G. Boothroyd, Warner Norcross & Judd LLP, Grand Rapids, Michigan, for Amicus Curiae Constitutional Law Scholars Elizabeth A. Clark, Carl H. Esbeck, and Robert J. Pushaw.

## OPINION

McKEOWN, Circuit Judge:

### INTRODUCTION

The merits of this lawsuit involve yet another clash between a state anti-discrimination law and the First Amendment.   But this appeal presents an antecedent question—whether the federal courts may pass on this important issue before the Attorney General commences an enforcement action.   Seattle Pacific University ("SPU") is a religious university that prohibits employees from engaging in same-sex intercourse and marriage.   After receiving a slew of complaints, the Washington Attorney General sent SPU a letter alerting it to an investigation under the Washington Law Against Discrimination ("WLAD") and requesting documents related to employment policies, employee complaints, and employee job descriptions.   In response, SPU filed suit against the Washington Attorney General to enjoin the investigation and any future enforcement of the WLAD.   The question is whether the district court has jurisdiction to hear this case. Based on a lack of redressability and *Younger* abstention, the district court granted the Attorney General's motion to dismiss.   We affirm in part and reverse in part.   We conclude that SPU has standing to bring certain claims and that *Younger* abstention does not bar the court from considering those claims.

### FACTUAL AND PROCEDURAL BACKGROUND

The WLAD declares a "right to be free from discrimination because of . . . sexual orientation." Wash. Rev. Code § 49.60.030.   The Washington State Human Rights Commission, created under the WLAD, is charged

with investigating and adjudicating complaints of discriminatory practices. *Id.* § 49.60.120.  In addition, the Attorney General and private individuals may sue employers for discriminatory practices. *Id.* §§ 49.60.030(2), 49.60.350.

The WLAD exempts religious nonprofit organizations from its definition of "employer." *Id.* § 49.60.040(11).  In 2021, however, the Washington Supreme Court determined that the WLAD's exemption of all religious nonprofit employers may violate Article I, Section 12 of the Washington State Constitution as applied to particular individuals. *See Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1070 (Wash. 2021) (en banc), *cert. denied*, 142 S. Ct. 1094 (2022).  That provision of the state constitution provides, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." WASH. CONST. art. I, § 12.  According to the Washington Supreme Court, the WLAD's differential treatment of religious organizations chafes against this clause. *Woods*, 481 P.3d at 1065–67.  At the same time, the court recognized that the First Amendment of the United States Constitution includes special protections for religious employers with regard to ministerial employees. *Id.*1067–69.  Analyzing the interplay between these competing principles, the court narrowed the WLAD's religious employer exemption to be coextensive with the ministerial exception recognized under federal law. *Id.* at 1069–70.

SPU is a private Christian university "under the auspices of the Free Methodist Church."  Free Methodists believe "sexual intimacy is a gift from God and is a great blessing in the sanctity of marriage between one man and one woman." In the spirit of this tenet, SPU "requires all of its regular

faculty and staff (other than student employees and temporary employees) . . . to abide by certain lifestyle expectations in keeping with the University's religious beliefs." Employees are prohibited from engaging in sexual intimacy outside of marriage, with marriage only recognized between one man and one woman.

In January 2021, a faculty applicant sued SPU alleging sexual orientation discrimination. The case settled, but it sparked debate within the university. Some students and faculty called on the Board of Trustees to change its policies, attracting media coverage. After forming a working group to study the issue, the Board rebuffed the calls for reform, voting to retain the existing employee conduct policy.

The Attorney General has received hundreds of complaints against SPU related to its employment policy. Shortly after the Board's decision, the Attorney General sent SPU a letter announcing a probe into SPU's employment policies and history. The letter requested (1) information regarding hiring, discipline, and employment policies, (2) a description of instances when the sexual orientation policies have been implemented, (3) any complaints from prospective, current, or former employees, and (4) the job descriptions for all employees. In addition, the Attorney General requested the retention of all documents relevant to the investigation.

SPU responded to the letter, seeking clarification on the scope of the probe and the Attorney General's interpretation of state and federal law. In reply, the Attorney General objected to SPU's lack of compliance with the request. Instead of tendering the requested documents, SPU filed this lawsuit. The Attorney General then issued a press release denouncing SPU's "illegal discrimination" and soliciting

more complaints.  The Attorney General also filed a motion to dismiss the lawsuit arguing that SPU failed to allege an injury, that any alleged injuries would not be redressable, that SPU's claims were not ripe, and that *Younger* abstention required dismissal.  After SPU filed a First Amended Complaint (the "Complaint"), the Attorney General refiled its motion to dismiss on the same grounds.

The Complaint alleged that the Attorney General's probe and future enforcement of the WLAD violated the First Amendment.  Specifically, SPU characterizes the Attorney General's actions as retaliation for constitutionally protected activities, an interference with church autonomy, selective enforcement of Washington law, and a denominational preference.  Counts II, VI, VII, IX, and X are prospective pre-enforcement claims challenging the impending enforcement of the WLAD; Counts I, III, IV, V, and VIII, and XI are retrospective claims challenging the Attorney General's investigation so far.

At oral argument, the district court questioned the Attorney General's counsel on the repercussions of SPU ignoring the inquiry letter.  Counsel replied, "[T]here are no legal consequences to ignoring our letter. . . . There are no other consequences."  The district court, ruling from the bench, dismissed the Complaint.  Assuming without deciding an injury in fact, the court found that the injury was not redressable and *Younger* abstention required dismissal.

## ANALYSIS

### I. Standing

We review de novo an order granting a motion to dismiss for lack of standing, and we rest our analysis on the Complaint's allegations, which we accept as true at the

pleading stage.  *See Southcentral Found. v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 416–17 (9th Cir. 2020); *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011).  To establish standing, SPU must meet the well-established requirements: "injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).  Here, only injury in fact and redressability are contested.

## A. Investigatory Probe—Injury in Fact

Six of SPU's claims allege an injury based on the Attorney General's probe to date—Counts I, III, IV, V, VIII, and XI. SPU contends that the Attorney General's request for documents chilled religious exercise, both because SPU was targeted for retaliation and because the probe intruded on religious autonomy.  This retrospective theory requires us to disregard any threat of future enforcement and focus on the Attorney General's past actions—namely, the request letter and the general investigation so far.  We conclude that SPU failed to state an injury in fact, and hence these counts were properly dismissed.

In a strikingly similar case, Twitter alleged that a Civil Investigative Demand ("CID") from the Texas Office of the Attorney General had a chilling effect on its free speech rights. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1172 (9th Cir. 2022).  We held that Twitter's vague assertions of chilled speech were insufficient to establish an injury. *Id.* at 1175. Crucially, the CID was non-self-executing: the Texas Attorney General must petition a court to enforce a CID if the recipient refuses to comply. *Id.* at 1176.  We concluded, "[T]o complain about the CID in this posture is to speculate about injuries that have not and may never occur." *Id.*

Although we grounded the decision on ripeness, we noted that the ripeness inquiry is "synonymous with the injury-in-fact prong of the standing inquiry." *Id.* at 1173 (cleaned up).

Like the CID in *Twitter*, the Attorney General's request for documents carries no stick: SPU would not face sanctions for ignoring it.  SPU endeavors to cast its injury as more concrete than that of Twitter, but we are not convinced. SPU alleges that the Attorney General's actions "require[d] [SPU] to make decisions about employment under a cloud of government investigation and impending penalties" and that SPU "believes that if it does not comply with the unconstitutional probe, then it will face serious penalties and litigation against Constitutionally protected actions."  These allegations mirror Twitter's claim that its "ability to freely make its own decisions as to what content to include on its platform is impeded by the persistent threat that government actors who disagree with those decisions may wield their official authority to retaliate, such as by issuing a burdensome CID or commencing an intrusive investigation." *Twitter*, 56 F.4th at 1175.  SPU's allegations are no more concrete.

As we know, not all First Amendment rights stand on equal footing.  In *Twitter*, the claimed injury was chilled speech, not the intrusion into church autonomy.  The Supreme Court has stressed that "the very process of inquiry" by the government may impinge the rights guaranteed by the Religion Clauses. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979).  Although this wrinkle distinguishes SPU's appeal from *Twitter*, it turns out to be a distinction without a difference.

SPU cites a string of cases emphasizing the firewall between secular employment standards and religious

organizations.   But none of those cases stand for the
proposition that SPU asks us to endorse.  In each case, the
question was unquestionably ripe: the agency or judicially
supervised investigation was exercising its coercive power.
*See, e.g.*, *Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
772 F.2d 1164, 1171 (4th Cir. 1985) ("Church personnel and
records would inevitably become subject to subpoena,
discovery, cross-examination, the full panoply of legal
process designed to probe the mind of the church in the
selection of its ministers.").[1]   SPU's Complaint proclaims,
"Church autonomy also forbids the 'forced disclosure' of
religious organizations' 'internal communications.'"   But
here, there is no "forced disclosure."   SPU asks us to
judicially shield it from a request for documents that could
simply be ignored.  As the Attorney General acknowledges,
there are "no legal consequences" or "other consequences"
flowing from the request.  Nothing in the Religion Clauses
transforms the Attorney General's request into an injury.

Nor can it be that *any* investigation into a religious
organization's employment practices creates a First
Amendment injury.  As SPU's own authorities make clear,
inquiring into the employment conditions of ministers may
offend the First Amendment, but an inquiry into *which*
employees are ministerial is fair game: "The ministerial
exception's status as an affirmative defense makes some
threshold inquiry necessary.  At the same time, discovery to
determine who is a minister differs materially from
discovery to determine how that minister was treated . . . ."

---

[1] *See also Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 827
(D.C. Cir. 2020) (challenging an NLRB order to bargain); *Whole
Woman's Health v. Smith*, 896 F.3d 362, 366–67 (5th Cir. 2018) (raising
a motion to quash a subpoena).

*Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 983
(7th Cir. 2021) (citing *Hosanna-Tabor Evangelical
Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4
(2012)).

This distinction is sensible.  If the First Amendment
barred any inquiry into religious employers, including an
inquiry into which employees are ministers, the ministerial
exception would be elevated from an affirmative defense to
affirmative immunity, and the Attorney General would have
no point of entry for an investigation of non-ministerial
employees.  A religious employer is not given carte blanche
with respect to all employees, ministerial and non-
ministerial alike.  As the Supreme Court has made clear,
"[t]his does not mean that religious institutions enjoy a
general immunity from secular laws, but it does protect their
autonomy with respect to internal management decisions
that are essential to the institution's central mission." *Our
Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct.
2049, 2060 (2020).  SPU's sweeping interpretation of the
ministerial exception would give religious organizations a
vast buffer zone, tantamount to a free pass, protecting far
more than just the "central mission" of the religious
institution.  *Id.*  To the contrary, First Amendment
protections serve as a sieve, not a lid.[2]

### B. Pre-Enforcement Injury In Fact

A separate framework applies to SPU's claims asserting
pre-enforcement standing—Counts II, VI, VII, IX, and X.
Pre-enforcement standing injuries are predicated on the

---

[2] Nor does it matter that the inquiry came from a government probe rather
than from a suit brought by an individual employee.  The scope of the
ministerial exception does not fluctuate based on the identity of the
challenging party.

anticipated enforcement of the challenged statute in the future and the resulting chilling effect in the present. Put simply, pre-enforcement standing hinges on whether a party has "alleged a sufficiently imminent injury for the purposes of Article III." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 151 (2014). In *Driehaus*, the Supreme Court offered up three benchmarks to determine whether there is "a credible threat of enforcement": (1) a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) a plaintiff's intended future conduct must be "arguably . . . proscribed by [the] statute" it wishes to challenge, and (3) the threat of future enforcement must be "substantial."[3]   *Id.* at 161–62, 164 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Under this framework, we conclude that SPU has alleged a pre-enforcement injury in fact.

### 1.   Course of Conduct Affecting a Constitutional Interest

The first *Driehaus* prong requires that the plaintiff has "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Id.* at 161 (quoting *Babbitt*, 442 U.S. at 298). As a religious university with specific parameters undergirding its employment practices, SPU's employment decisions are plainly affected with First Amendment interests. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060. The real question is whether SPU has sufficient intention to act.

---

[3] *See Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 486–87 (9th Cir. 2024), for a synopsis of the evolution of Ninth Circuit caselaw on pre-enforcement standing.

The Attorney General posits that "[i]n the absence of any fact allegation by SPU of how it plans to refuse to hire, fire, or otherwise discriminate against non-ministerial employees because of their sexual orientation, SPU fails to show that it intends to act in a course of conduct proscribed by the WLAD." But the Attorney General misunderstands the inquiry. To be sure, bare bones pleadings merely asserting that the plaintiffs are subject to the challenged law are not enough. *See Carrico*, 656 F.3d at 1006–07. Some of our precedents suggest that pre-enforcement standing requires the "when, to whom, where, or under what circumstances" the plaintiff plans to violate the law. *See Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1211 (9th Cir. 2022) (quoting *Lopez*, 630 F.3d at 787). When, however, a plaintiff has previously engaged in conduct that would violate the challenged law, we have relaxed the requisite level of detail. *See Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) ("[W]e do not require plaintiffs to specify 'when, to whom, where, or under what circumstances' they plan to violate the law when they have already violated the law in the past." (citation omitted)).

SPU has evidenced a sufficient intention to continue its employment practices. In the face of faculty and student pressure to change its policies, the Board voted to retain the existing employee conduct policy prohibiting same-sex marriage and intimacy. SPU further alleges that it "would be automatically disaffiliated from the Free Methodist Church" if it permitted employment of "Christians in same-sex marriages." These allegations suffice to meet the requirement of "an intention to engage in a course of conduct" that intersects with the claimed First Amendment interest. *Driehaus*, 573 U.S. at 161 (citation omitted).

### 2.  Conduct Arguably Proscribed by Washington Law

SPU's employment practices are arguably proscribed by Washington law, which prohibits employment discrimination on the basis of sexual orientation. The Attorney General essentially agrees but counters that, because the WLAD does not affect ministerial employees, SPU's hiring practices are not proscribed. But that argument is circular: it is tantamount to saying that so long as SPU is not violating the WLAD, the WLAD does not prohibit its hiring practices. This reasoning, of course, collapses on itself in this situation. The Complaint is crystal clear that SPU has applied and will continue to apply its sexual conduct policies to *all* regular faculty and staff, ministers and non-ministers alike. These policies arguably violate the WLAD, even according to the Attorney General. In its letter requesting documents, the Attorney General stated that SPU's employment policies are "possibl[y] discriminatory" and "may violate the Washington Law Against Discrimination." Even more pointed, in a press release after SPU filed its initial Complaint, the Attorney General denounced SPU's "illegal discrimination" and solicited more complaints. Thus, SPU's course of conduct is arguably proscribed by the WLAD.

### 3.  Substantial Threat of Enforcement

The final *Driehaus* factor requires a substantial threat of enforcement, which is often linked to the enforcing authority's willingness to disavow enforcement. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–56 (9th Cir. 2000) ("While we cannot go so far as to say that a plaintiff has standing whenever the Government refuses to rule out use of the challenged provision, failure to disavow 'is an attitudinal

factor the net effect of which would seem to impart some substance to the fears of [plaintiffs].'" (quoting *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991))). Here, the Attorney General has not disavowed its intent to investigate and enforce the WLAD against SPU. Instead, in a press release responding to this lawsuit, the Attorney General affirmatively solicited more complaints of "possible employment discrimination by Seattle Pacific University."

The letter requesting documents and a litigation retention hold is also a clear sign of a substantial threat. *See Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1092 (9th Cir. 1992) (upholding jurisdiction when the United States Attorney's Office sent a letter informing the tribe that its "Pick 6" lotto violated state and federal law and requesting discontinuation). Without doubt, the Attorney General's letter caused SPU to have a "real and reasonable apprehension that [it] will be subject to liability." *Id.* (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 (9th Cir. 1990)). The letter stated that "[t]he AGO has recently learned about possible discriminatory employment policies and practices by Seattle Pacific University that may violate the Washington Law Against Discrimination" and informed SPU that "the AGO is opening an inquiry to determine whether the University is meeting its obligations under state law." The letter further enclosed a "certification regarding the retention of documents" and requested that SPU "maintain in their current forms all records, documents, files, and electronically stored material that may be relevant to this investigation." Thus, the letter clearly raises the specter of potential administrative or judicial proceedings. This course of conduct is hardly without consequence.

Taken as a whole, the allegations in the Complaint satisfy the *Driehaus* test and establish an injury with respect to Counts II, VI, VII, IX, and X.

### C. Redressability

For an injury to be redressable, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). Here, the redressability of SPU's alleged injury is plain:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Id.* at 561–62. SPU is challenging the future enforcement action of a state actor, and the court has the power to enjoin the action or issue relief through a declaration of rights. *See e.g.*, *Ted Cruz for Senate v. FEC*, 542 F. Supp. 3d 1, 5–6 (D.D.C. 2021) (invalidating and enjoining the enforcement of Section 304 of the Bipartisan Campaign Reform Act of 2002), *aff'd sub nom.*, *FEC v. Cruz*, 596 U.S. 289 (2022).

The district court, however, rejected redressability for three reasons: (1) the prohibition on advisory opinions bars

declarative relief, (2) a federal court cannot change state law, and (3) an injunction would impermissibly entangle the court with a religious institution. As we explain, none of the rationales defeat redressability.

### 1. Declaratory Relief

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Decades ago, the Supreme Court anointed the Declaratory Judgment Act as constitutional. *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240–41 (1937).

The district court, however, eschewed its power to issue declaratory relief. It correctly noted that Article III courts "don't issue advisory opinions," but then jumped to the conclusion that the court cannot grant declaratory relief in this case. To be sure, "[t]here was a time" when the courts "harbored doubts about the compatibility of declaratory-judgment actions with Article III's case-or-controversy requirement." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007). But the Supreme Court has long since "dispelled" such doubts. *Id.* Declaratory relief does not necessarily translate into an advisory opinion. *See e.g.*, *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 749 (9th Cir. 2020) (holding that declaratory relief could redress the alleged injury); *Clark v. City of Lakewood*, 259 F.3d 996, 1007 (9th Cir. 2001), *as amended* (Aug. 15, 2001) ("If a plaintiff has standing to seek injunctive relief, the plaintiff also has standing to seek a declaratory judgment.").

At the edges, there may be some ambiguity as to which declaratory-judgment actions are justiciable under Article III.  But this ambiguity generally arises with respect to injury in fact or ripeness, and in any event, this is not an edge case.  In *MedImmune*, the Supreme Court took up the ripeness of a case in which a "plaintiff's self-avoidance of imminent injury is coerced by threatened enforcement action of *a private party* rather than the government."  549 U.S. at 130.  The Court began with the "recognition" that "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced."  *Id.* at 128–29.  Indeed, it is not uncommon for plaintiffs with pre-enforcement injuries to seek declaratory relief.  *See, e.g.*, *Driehaus*, 573 U.S. at 154; *Steffel v. Thompson*, 415 U.S. 452, 475 (1974); *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 486 (9th Cir. 2024); *LSO*, 205 F.3d at 1150.  Thus, there is a wealth of precedent supporting the redressability of pre-enforcement injuries with declaratory relief.  SPU requests a declaratory judgment that the First Amendment protects its employment decisions and that the Attorney General cannot target SPU in a retaliatory or non-neutral manner—a request that falls well within traditional declaratory relief.

### 2.  Changing State Law

We do not read SPU's claims as an effort for us to rewrite state laws.  The district court saw it otherwise, stating, "[A] careful examination of [SPU's requests for injunctive relief] indicates that plaintiffs are asking for a change to the state law against discrimination, or for limits to it, and also, possibly, limits on the state attorney general's investigatory authority.  This Court doesn't have the power to change the

state law." Obviously, federal courts do not have the power to rewrite or change state statutes with a red pen, but our decisions may properly delineate constitutional limits on state statutes.

The pre-enforcement posture of this appeal does not alter our conclusion. In *Tingley v. Ferguson*, a licensed therapist sought to enjoin the enforcement of a Washington state law prohibiting the practice of conversion therapy on children. 47 F.4th at 1063. We held that, although the plaintiff's claims were ultimately without merit, he had standing to seek injunctive relief. *Id.* at 1091. Similarly, in *Wolfson v. Brammer*, the Ninth Circuit clarified:

> These defendants have the power to discipline Wolfson and, if they are enjoined from enforcing the challenged provisions, Wolfson will have obtained redress in the form of freedom to engage in certain activities without fear of punishment. . . . It is true that Wolfson cannot obtain revision of the Code from these defendants, but Wolfson may nevertheless **obtain** a form of effective redress in this action.

616 F.3d 1045, 1056–57 (9th Cir. 2010).

The fact that private parties remain free to sue SPU does not undercut redressability. Private enforcement is simply an additional available remedy. It is true that the redressability prong of standing cannot be met when redress depends on "the unfettered choices made by independent actors." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). But that is not the circumstance here. Potential declaratory or injunctive relief would directly redress the injury

stemming from the Attorney General's threat of enforcement. That private actors could also seek to enforce the WLAD does not defeat the court's ability to redress harms specific to the Attorney General.

In short, we have the authority to address the constitutionality of the Washington law as applied to SPU.

### 3. Entanglement with Religion

The district court also found SPU's injury non-redressable because injunctive relief would force the court to violate the Religion Clauses. The court framed the issue as a catch-22: if the court does nothing, then the Attorney General may be entangled with religion; but if the court enjoins the action, then the court must become entangled with religion. This is a false dilemma.

As already noted, neither the court nor the Attorney General would violate the Religion Clauses by inquiring into which employees are ministerial. As a consequence, issuing a limited injunction would not necessarily entangle the court in religion. More fundamentally, redressability should not be conflated with the merits. SPU need only show that the court could fashion an injunction that could redress its injuries. *Wolfson*, 616 F.3d at 1056 ("A plaintiff meets the redressability requirement if it is likely, although not certain, that his injury can be redressed by a favorable decision."). The scope of any injunctive relief—such as a narrow injunction related to ministerial employment—hinges on a merits determination, not redressability. For example, if the court were to find some aspects of SPU's First Amendment claims to be meritorious, the court could enjoin certain aspects of the investigation or enforcement of the WLAD against SPU. *See, e.g.*, *id.* at 1057.

An evaluation of SPU's specific injunctive requests is unnecessary at this stage.  The district court has discretion to fashion its own equitable relief.  As Justice Douglas wrote:

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.  Flexibility rather than rigidity has distinguished it.  The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944).  It may be, as the litigation unfolds, that declaratory relief redresses the injury and injunctive relief is unnecessary.  Alternatively, it may be appropriate for the court to proactively narrow the scope of potential subpoenas.  Or, of course, it may be that SPU's claims are without merit and no remedy is warranted. The range of remedies underscores that the district court has the power to redress the alleged injury.

## II. *Younger* **Abstention**

We next consider whether the case should have been dismissed under *Younger v. Harris*, 401 U.S. 37 (1971), an issue we review de novo.  *See Bristol-Myers Squibb Co. v. Connors*, 979 F.3d 732, 735 (9th Cir. 2020).  In *Younger*, the Supreme Court declared a "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances."  401 U.S. at 41.  We invoke a "five-prong test" to determine whether a civil case is *Younger*-eligible:  "*Younger* abstention is

appropriate only when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *Rynearson v. Ferguson*, 903 F.3d 920, 924–25 (9th Cir. 2018) (quoting *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)). Because there are no ongoing enforcement actions or any court judgment, abstention under *Younger* is not warranted.

To begin, there is no state court proceeding here. Nor is there an administrative proceeding or other enforcement action. And clearly, a prosecuting or enforcing entity's investigation *alone* is neither a "quasi-criminal enforcement action[]" nor an enforcement action at all. *See Rynearson*, 903 F.3d at 924–25. The Attorney General has no independent authority to sanction SPU under the WLAD. Wash. Rev. Code §§ 46.60.240, 46.60.250, 46.60.340. As a result, the investigation "cannot be said to have been brought 'to sanction the federal plaintiff . . . for some wrongful act,' which is the quintessential feature of a *Younger*-eligible 'civil enforcement action.'" *Applied Underwriters, Inc. v. Lara*, 37 F.4th 579, 589 (9th Cir. 2022) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79 (2013)).

Faced with these obvious problems, the Attorney General attempts another route to *Younger* abstention—the district court properly abstained because the investigation is an extension of soon-to-be-initiated state court proceedings, even though no complaint has yet been filed. Under this theory, however, the state court proceedings are not "ongoing."

The Attorney General's threat of enforcement in this case is sandwiched between pre-enforcement standing and the initiation of state proceedings. It has long been established that the mere threat of state enforcement is insufficient to justify federal court abstention. *See Steffel,* 415 U.S. at 454, 462 (holding that *Younger* does not prevent federal declaratory relief "when a state prosecution has been threatened, but is not pending"). Indeed, if there were no daylight between the invocation of pre-enforcement standing and the start of *Younger* abstention, then litigants would have virtually no opportunity to seek federal review of state laws infringing on constitutional rights.

Prior to a threat of enforcement, no Article III standing exists. After state proceedings commence, *Younger* abstention prohibits federal court intervention for the duration of the proceedings. After state proceedings have concluded, the *Rooker-Feldman* doctrine would likely bar federal courts from reviewing the state court decision with narrow exceptions. *See Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994). And so, the question of what space exists between the start of pre-enforcement standing and the start of "ongoing" state proceedings may dictate many litigants' opportunity to seek a federal remedy *at all*. *See Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1229 (4th Cir. 1989) ("[T]he period between the threat of enforcement and the onset of formal enforcement proceedings may be an appropriate time for a litigant to bring its First Amendment challenges in federal court. Indeed, if this time is never appropriate, any opportunity for federal adjudication of federal rights will be lost.").

The Attorney General points to precedent establishing that state court proceedings can be "ongoing" in the investigation stage. True, but these cases are inapposite

because proceedings were actually initiated. *See Partington v. Gedan*, 961 F.2d 852, 861 (9th Cir. 1992), *as amended* (July 2, 1992) ("[The claim] is based in part on the Rule 2 disciplinary investigation. In that regard, it clearly seeks relief with respect to a pending state proceeding."); *see also San Jose Silicon Valley Chamber of Com. Pol. Action Comm. v. City of San Jose*, 546 F.3d 1087, 1092 (9th Cir. 2008) ("The state-initiated proceeding in this case—the Elections Commission's investigation of Plaintiffs' activities—is ongoing."), *abrogated on other grounds by Sprint Commc'ns*, 571 U.S. 69. A state supreme court disciplinary proceeding and an election commission investigation are exceptional and not comparable to a run-of-the-mill Attorney General investigation to determine if further action is warranted.

More specifically, in those cases applying *Younger* abstention in the investigation stage, the investigative entity had independent authority to sanction or discipline the target. *See Partington*, 961 F.2d at 861; *San Jose Silicon Valley Chamber*, 546 F.3d at 1089. In other words, there was no need to file with a separate adjudicative body. This understanding comports with the Supreme Court's guidance that the proceeding must be "judicial in nature." *See Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627 (1986) ("Because we found that the administrative proceedings in *Middlesex* were 'judicial in nature' from the outset, it was not essential to the decision that they had progressed to state-court review by the time we heard the federal injunction case." (citation omitted)). An investigation alone is not enough, but when the entity is vested with enforcement or adjudicatory power, then the investigation may signal an ongoing quasi-judicial proceeding. Put differently, when the investigative entity

and the adjudicative entity are separate, "ongoing" proceedings begin with the first filing with the adjudicative body; but when the adjudicative body also has investigatory responsibilities, a functional approach governs.

The Attorney General, unlike the Washington State Human Rights Commission and Washington administrative law judges, cannot independently sanction SPU. Wash. Rev. Code §§ 46.60.240, 46.60.250, 46.60.340. Rather, the Attorney General must file a lawsuit in state court to enforce the WLAD, something he has yet to do. *See* Wash. Rev. Code § 49.60.350. This ends the *Younger* inquiry. The district court should not have abstained under *Younger*.

### III. Prudential Ripeness

Finally, we consider whether, at the Attorney General's instigation, we should affirm the district court on prudential ripeness grounds, although the district court did not address this issue.[4] Prudential ripeness is discretionary. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000) (en banc). "[T]wo overarching considerations" animate the doctrine: "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *Id.* at 1141 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)). The first consideration gives credence to the principle that "a court cannot decide constitutional questions in a vacuum." *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007); *see also Thomas*, 220 F.3d at 1141 ("The record

---

[4] The Attorney General also argues that SPU has failed to allege constitutional ripeness. The analysis for constitutional ripeness and pre-enforcement injury is the same. *See Thomas*, 220 F.3d at 1138. As discussed above, SPU has established a pre-enforcement injury; therefore, SPU has established constitutional ripeness.

before us is remarkably thin and sketchy, consisting only of a few conclusory affidavits.  A concrete factual situation is necessary to delineate the boundaries of what conduct the government may or may not regulate." (internal quotation marks and citation omitted)).   The second consideration weighs the hardships to the parties—particularly, plaintiffs who have already demonstrated a constitutional injury. "Evaluating whether withholding judicial review presents a hardship requires looking at whether the challenged law 'requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.'" *Tingley*, 47 F.4th at 1070–71 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)).

We note that the Supreme Court in dictum has questioned the "continued vitality" of prudential ripeness doctrine: "To the extent respondents would have us deem petitioners' claims nonjusticiable on grounds that are prudential, rather than constitutional, that request is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Driehaus*, 573 U.S. at 167 (cleaned up).  The Court appears to have walked up to the line but stopped short of abrogating the doctrine.

Because the district court did not rule on this issue below, and instead granted the motion to dismiss on standing and *Younger* abstention grounds, we remand to the district court to consider the issue in the first instance.

## CONCLUSION

We affirm the district court's dismissal of Counts I, III, IV, V, VIII, and XI, because we determine that SPU failed to allege a cognizable injury in fact for its retrospective

claims.  In contrast, we conclude that SPU has standing for its prospective pre-enforcement injury claims—Counts II, VI, VII, IX, and X—and therefore reverse the dismissal of those claims. *Younger* abstention does not support dismissal of SPU's Complaint. We remand to the district court to consider prudential ripeness.

Each party shall pay its own costs on appeal.

**AFFIRMED IN PART AND REVERSED IN PART.**